**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Raul RODRIGUEZ, Defendant–**
**Appellant.**

**No. 91–5457.**

United States Court of Appeals,
Eleventh Circuit.

Dec. 22, 1992.

Hector L. Flores, Asst. Federal Public Defender, Miami, Fla., for defendant-appellant.

Linda Collins Hertz, Alice Ann Burns, Dawn Bowen, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, EDMONDSON, Circuit Judge, and MORGAN, Senior Circuit Judge.

PER CURIAM:

The appellant, Raul Rodriguez, was convicted of importing a Schedule II controlled substance in violation of 21 U.S.C. § 952(a) (1988). He challenges the district court's

calculation of his sentence, in accordance with 21 U.S.C. § 960(b) and the United States Sentencing Guidelines § 2D1.1(a)(1) (Nov. 1, 1991), for importation of "cocaine base." Because we find that the term "cocaine base" includes, but is not limited to, "crack cocaine," we affirm his sentence.

## I.

On August 24, 1990, Raul Rodriguez entered the United States from Panama at the Miami International Airport. Upon inspection at the customs check-point, officials discovered that Rodriguez' tennis shoes contained 680 grams of cocaine base. On September 5, 1990, a federal grand jury indicted Rodriguez for possession, under 21 U.S.C. § 841(a)(1), (count I) and importation, under 21 U.S.C. §§ 952(a) and 960(a)(1), (b), (count II) of a Schedule II narcotic. On December 13, 1990, pursuant to a plea agreement, Rodriguez pled guilty to count II and the Government dismissed count I. Judgment was entered against Rodriguez for importation of cocaine base on April 15, 1991.

Applying Guidelines §§ 2D1.1(a)(3) and (c)(4) (Drug Quantity Table, "[a]t least 500 G but less than 1.5 KG of Cocaine Base"), the Presentence Investigation Report (PSI) specified a base offense level of 36. With a two-point reduction for acceptance of responsibility under Guidelines § 3E1.1(a) and a Criminal History Category of I, the applicable guideline range was 151–188 months of imprisonment. If the chemical had been found to be a cocaine salt (cocaine hydrochloride) instead of a cocaine base, his base offense level would have been 26, and, with a two-point reduction for acceptance of responsibility, his applicable guideline range would have been 51–63 months. *See* U.S.S.G. § 2D1.1(c)(9).

At the sentencing hearing, Rodriguez argued that Congress intended the enhanced penalty provisions for importation of cocaine base in 21 U.S.C. § 960 and U.S.S.G. § 2D1.1 to apply only to crack cocaine.

Rodriguez' expert, Dr. Donald Roach, testified that the imported substance was not crack cocaine but a substance more closely resembling cocaine hydrochloride. Nevertheless, Dr. Roach testified that the imported substance was chemically cocaine base and that the substance was smokeable in its existing form. The Government responded that the imported substance "is equal in chemical composition and addictive [potential to] cocaine base in the crack form," and "that the statute says cocaine base[, not crack cocaine,] shall be punished at a certain level." While objecting to the Government's interpretation of the statute, Rodriguez did not present evidence rebutting the Government's characterizations of the imported substance.

The court observed that while the imported substance might be transformed into both cocaine hydrochloride and, with additional steps, crack cocaine, the imported substance was cocaine base which could be consumed—like crack cocaine—in its present form. Following the PSI's calculations based on importation of cocaine base, the court sentenced Rodriguez to 151 months imprisonment to be followed by five years of supervised release, and a special assessment of · fifty dollars.[1] Rodriguez then lodged this appeal. We affirm.

## II.

### A.

In 1986, Congress addressed "a frightening and dangerous new twist in the drug abuse problem—the growing availability and use of a cheap, highly addictive, and deadly form of cocaine known on the streets as 'crack.'" *"Crack" Cocaine: Hearing Before the Permanent Subcomm. on Investigations of the Senate Comm. on Governmental Affairs*, 99th Cong., 2d Sess. 1 (1986) (Statement of Sen. Roth). "In layman's terms 'crack' is a form of cocaine that can be inhaled, goes rapidly to the brain, and for which very small dosage units are sufficient for initial

---

1. Count II required a minimum sentence of 10 years and at least five years supervised release. *See* 21 U.S.C. §§ 952(a) and 960(a)(1), (b)(1)(C); *see also* U.S.S.G. § 5D1.2(a) (requiring super-

vised release to be at least three years but not more than five years, or the minimum period required by statute). A fifty dollar assessment is mandatory under 18 U.S.C. § 3013(a)(2)(A).

uses."[2] *United States v. Buckner*, 894 F.2d 975, 976 n. 1 (8th Cir.1990). These characteristics of cocaine bases, such as crack, provided a "loophole that actually encourages drug dealers to sell the more deadly and addictive substance, and lets them sell thousands of doses without facing the maximum penalty possible." 132 Cong.Rec. S.8091–06 (daily ed. June 20, 1986) (statement of Sen. D'Amato). To discourage this practice, Congress enhanced the penalty provisions for cocaine base. The provisions link the severity of the sentence with the quantity of substance involved. Congress enhanced the sentence for cocaine base by equating the penalty associated with a given quantity of cocaine base with the penalty associated with 100 times that quantity of cocaine. For example, the minimum sentence for crimes involving five kilograms or more of a substance containing cocaine equals the minimum sentence for fifty grams or more of a substance containing cocaine base. *Compare* 21 U.S.C. § 960(b)(1)(B)(ii) *with id.* § 960(b)(1)(C) (1988 and Supp. II).[3] We have held that a rational basis exists for the disparity in penalties resulting from application of the 100–to–1 ratio. *See United States v. King*, 972 F.2d 1259, 1260 (11th Cir.1992) ("The fact that crack cocaine is more addictive, more dangerous, and can be sold in smaller quantities than powder cocaine is sufficient reason for Congress to provide harsher penalties for its possession.").

### B.

■ The district court's interpretation of the guidelines and related statutes is subject to *de novo* review. *United States v. Goolsby*, 908 F.2d 861, 863 (11th Cir.1990).

■ The sole issue on appeal is whether the term "cocaine base" as used in 21 U.S.C. § 960(b) and U.S.S.G. § 2D1.1, refers to all forms of cocaine base or only cocaine base when found in a rock or crack form.[4] In his "Sentencing Memorandum," Rodriguez argued that while

all crack cocaine is cocaine base, ... not all cocaine base is crack. An analysis of case law, legislative history, and United States Sentencing Guidelines reveals that the term "cocaine base" is widely used interchangeably with the term "crack." ... the substance in question in this case was not intended to be punished as crack cocaine is under the statute, and the guidelines.

Based on Dr. Roach's testimony that the imported substance was a non-crack form of cocaine base, Rodriguez asserts that the guideline provisions for cocaine base should not be applied in his case.[5]

We have held that the 100–to–1 ratio is not "arbitrary and capricious," *United States v. Lawrence*, 972 F.2d 1580, 1582 (11th Cir.1992) (per curiam) (applying 21 U.S.C. § 841), nor is the term "cocaine base" vague for lack of a specific statutory definition, *United States v. Williams*, 876 F.2d 1521, 1525 (11th Cir.1989) (applying 21 U.S.C. § 841). In both *Lawrence* and *Williams*, however, the underlying offense involved crack cocaine, and so we have not had the occasion to determine whether the term "cocaine base" applies only to crack cocaine. *See also King*, 972 F.2d at 1259–

---

**2.** The statute and the guidelines identify two different classes of cocaine substances: cocaine salts and cocaine bases. Crack cocaine is one form of cocaine base which "is prepared for inhalation and is absorbed by the body through the lungs." *United States v. Jones*, 979 F.2d 317, 319 (3rd Cir.1992). Cocaine salts, commonly known as cocaine, are white, powdery substances that are "usually 'snorted' or sniffed up the nose, and absorbed by the nasal passages." *Id.*

**3.** Congress did not specify whether this "100–to–1 ratio" should apply to quantities of less than 50 grams of cocaine base. The Sentencing Commission, however, has extended the application of the "100–to–1 ratio" to quantities of cocaine base below 50 grams. *See* U.S.S.G. § 2D1.1(c)(7)–(16); *United States v. Lawrence*, 972 F.2d 1580, 1583 (11th Cir.1992) (per curiam) (rejecting challenge to application of the 100–to–1 ratio to quantities below 50 grams).

**4.** Rodriguez' brief on appeal vaguely articulates an "equal protection" claim under the Fifth Amendment. He did not raise this issue below and, therefore, could not properly present this argument on appeal.

**5.** He suggests that the guideline provisions for cocaine salts should apply.

60 (using the terms "cocaine base" and "crack cocaine" interchangeably).

As many circuits have observed, the term "cocaine base" has a specific scientific meaning. *See, e.g., United States v. Jackson,* 968 F.2d 158, 161 (2d Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 664, — L.Ed.2d — (1992); *United States v. Levy,* 904 F.2d 1026, 1033 (6th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 974, 112 L.Ed.2d 1060 (1991); *United States v. Van Hawkins,* 899 F.2d 852, 854 (9th Cir. 1990); *United States v. Brown,* 859 F.2d 974, 975–76 (D.C.Cir.1988). *But see United States v. Shaw,* 936 F.2d 412, 414–16 (9th Cir.1991).[6] Rodriguez suggests no alternative meaning but argues that Congress intended the term "cocaine base" to be synonymous with "crack cocaine." In essence, he asserts that Congress, in drafting 21 U.S.C. § 960, did not understand the words it chose. To support his argument, Rodriguez points to the previously noted passage of legislative history:

> Because crack is so potent, drug dealers need to carry much smaller quantities of crack than of cocaine powder. By treating 1,000 grams of [freebase] cocaine no more seriously than 1,000 grams of cocaine powder, current law provides a loophole that actually encourages drug dealers to sell the more deadly and addictive substance, and lets them sell thousands of doses without facing the maximum penalty possible.

132 Cong.Rec. S.8091–06 (daily ed. June 20, 1986) (statement of Sen. D'Amato). He contends that this passage, and the legislative history in general, demonstrates "Congress's concern in enacting the '100–to–1

sentencing ratio' was aimed [solely] at 'crack cocaine.' " We disagree.

While Rodriguez correctly points out that the legislative history focused on the malevolent nature of crack cocaine, he has provided, and we have found, no indication that Congress intended to focus *solely* on the crack cocaine problem. Given that crack is a slang term and that other forms of cocaine base (including the substance imported in the instant case) also present significant dangers, Congress could reasonably have chosen to address the "crack problem" by enhancing the penalties for the more broad class of cocaine bases.

"[W]here Congress has used technical words or terms of art, 'it [is] proper to explain them by reference to the art or science to which they [are] appropriate.' " *Jackson,* 968 F.2d at 161 (quoting *Corning Glass Works v. Brennan,* 417 U.S. 188, 201, 94 S.Ct. 2223, 2231, 41 L.Ed.2d 1 (1974) (internal quotations omitted)). While the precise meaning of the term "cocaine base" is not before this court, it is clear that the term only has meaning as a scientific term. We will not second-guess Congress' decision to employ the scientific term "cocaine base" in section 960(b).

We hold, therefore, that Congress intended to use the scientific meaning of the term cocaine base in 21 U.S.C. § 960(b). Additionally, because "the Sentencing Commission [is presumed to] intend[ ] the terms they use[ ] to have the same meanings as the terms Congress used," *Shaw,* 936 F.2d at 415, we hold that the scientific meaning of the term cocaine base also applies in U.S.S.G. § 2D1.1. Since Rodriguez concedes that the substance he imported was cocaine base, he falls within the provisions of 21 U.S.C. § 960 and U.S.S.G. § 2D1.1.

---

**6.** *Shaw* is the only circuit court decision that has rejected a chemical definition for "cocaine base." The *Shaw* court's analysis relied on a reference to "crack" in the guidelines, *see Shaw,* 936 F.2d at 415 (citing U.S.S.G. § 2D1.1, comment. (n. 10, Drug Equivalency Tables) ("1 gm of Cocaine Base ('Crack') equals 100 gm of cocaine/20 gm of heroin")) and earlier versions of the proposed *Anti–Drug Abuse Act* referring to "cocaine freebase," which it found to be a slang term for cocaine that is heated and inhaled as smoke. *Id.* (citing New Dictionary of American Slang at 147). We find this analysis unper-

suasive: Congress ultimately chose the chemical term, cocaine base, and subsequent characterizations by the Sentencing Commission and terminology rejected by Congress do not provide a basis for repudiating that decision. *See Jackson,* 968 F.2d at 162 ("We do not believe that a parenthetical phrase in a drug equivalency table in an application note to a Guideline is enough to narrow the meaning of the chemical term selected by Congress."); *id.* ("Congress ... did not use the term 'cocaine freebase' in the statute but instead selected the term 'cocaine base' ").

The district court properly sentenced Rodriguez in accordance with these provisions.

The sentence is therefore

AFFIRMED.